UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

CARLOS ARCE, JORGE LUIS ACUNA,
CRISTIAN JARQUIN, MIGUEL ACARO,
RAFAEL RAMIREZ, and COSME TERRERO
SANTANA, on behalf of themselves and all
other persons similarly situated,

                         Plaintiffs,

        -against-

SOVEREIGN INDUSTRIES GROUP INC.,
WENDELL DeSOUZA SOARES, and JOHN
DOES #1-10,

                        Defendants.
_____

**MEMORANDUM & ORDER**
**19-CV-489 (NGG) (JRC)**

NICHOLAS G. GARAUFIS, United States District Judge.

Carlos Arce, Jorge Luis Acuna, Cristian Jarquin, Miguel Acaro, Rafael Ramirez, and Cosme Terrero Santana (together, "Named Plaintiffs"), as well as 27 Opt-In Plaintiffs (together with Named Plaintiffs, "Plaintiffs") allege that Sovereign Industries Group Inc. ("Sovereign"), Wendell DeSouza Soares ("Soares"), and ten John Does (together, "Defendants") are liable for failing to provide overtime pay under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and New York Labor Law ("NYLL") art. 19 § 650, *et seq.* (Amended Complaint ("Am. Compl.") (Dkt. 35) ¶¶ 1-2, 64-74.) Plaintiffs also allege that Defendants are liable for failing to provide Plaintiffs with wage notices as required by New York's Wage Theft Prevention Act, NYLL art. 6 §§ 195(1), (3). (*Id.* ¶¶ 2, 75-80.) Pending before the court is Defendants' motion for summary judgment as to Opt-In Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56. (Defs.' Not. of Mot. (Dkt. 140) at 1; Mem. in Support of Mot. ("Mot.") (Dkt. 141).) Opt-In Plaintiffs have failed to oppose the motion.

For the reasons stated below, the court GRANTS Defendants' motion for summary judgment[1] as to all 27 Opt-In Plaintiffs' claims. The court also DIRECTS the parties to file a status report with a proposed deadline for submitting their joint pretrial order within seven days of this Order.

## I.  BACKGROUND

### A.  Factual Background

The court assumes the parties' familiarity with the facts of this case. (*See* Mem. and Order dated 06/14/2024 ("June Mem. and Order") (Dkt. 134) at 2-5 (providing factual summary based on the facts derived from Defendants' Rule 56.1 Statement).) Again, because the motion is unopposed, this court relies on the admitted facts submitted by the moving party.[2] In short, Sovereign was

---

[1] Defendants style their motion as a "Motion for Summary Judgment to Dismiss Opt-In Plaintiffs," in which they ask the court "for an Order dismissing with prejudice the claims of all 27 Opt-In Plaintiffs to this action pursuant to [Federal Rule of Civil Procedure] 56." (Defs.' Not. of Mot. at 1.) Defendants appear to blend the concepts of a motion to dismiss and a motion for summary judgment. Nevertheless, Defendants' motion is, at bottom, a request that the court conclude as a matter of law that Defendants did not "employ" the Opt-In Plaintiffs and therefore cannot be held liable for their claims under the FLSA and NYLL. (Mot. at 2 ("The only remaining question is whether . . . as a matter of law, Defendants were not [the Opt-In Plaintiffs'] employers.").) As such, the court treats Defendants' motion as one for summary judgment against the Opt-In Plaintiffs.

[2] These facts are deemed admitted as they appear in Defendants' unopposed Local Civil Rule 56.1 Statement ("Rule 56.1 Statement") and are supported by admissible evidence. E.D.N.Y. Loc. Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts . . . will be deemed to be admitted . . . unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244

in the construction industry from June 2017 until September 2019. (*See* Defs.' Rule 56.1 Statement of Material Facts ("Defs.' St.") (Dkt. 125) ¶¶ 2, 4-6; *see also* Mot. at 3 (referring and incorporating by reference the previously submitted statement of material facts).) Its only corporate officers are its President and co-owner, Wayne Warner ("Warner"), and Vice President and co-owner Soares. (*See* Warner Decl. (Dkt. 129) ¶ 3.) While in business, Sovereign hired multiple subcontractors, who in turn hired their own laborers, including the Plaintiffs, to work on multiple construction projects involving concrete superstructure work for Sovereign. (Defs.' St. ¶¶ 45, 47.) Sovereign's work was limited to six construction projects in Manhattan and Queens, (*id.* ¶ 2), including on 45-07 Court Square, Queens, NY 11101 ("Court Square") and 131-05 (or 131-11) Fowler Avenue, Flushing, NY 11355 ("Fowler Ave."). (*See id.* ¶ 46.)

Sovereign and the subcontractors entered into multiple subcontractor agreements to memorialize their relationships. (*Id.* ¶¶ 56-57.) According to those agreements, Sovereign was to serve as a prime contractor for concrete superstructure work. (*Id.* ¶ 180.) The agreements provided that the subcontractor shall "[s]upply labor to perform work for Sovereign." (*See, e.g.,* Fowler Ave. Agreement (Dkt. 129-2) art. 8). Although Sovereign submitted copies of agreements relating to each project, it did not provide copies of other documents referenced within the same subcontracting agreements. (*See* June Mem. and Order at 3-4.) For example, "the Prime Contract, consisting of the Agreement between the Owner and Contractor," is not part of the record. (*See* Fowler Ave. Agreement § 1.1.)

Three foremen working for the subcontractors, Reinaldo Silva ("Junior"), Marcos Andre Araujo ("Andre"), and Flavio Marquez

---

(2d Cir. 2004) (emphasizing that the district court must be satisfied that the citation to evidence in the record in the moving party's Rule 56.1 Statement supports the assertion).

("Flavio"), were the primary points of contact between Sovereign and Opt-In Plaintiffs. (Defs.' St. ¶¶ 118, 129, 131, 133; Soares Decl. (Dkt. 128) ¶¶ 21-22.) These foremen hired and fired the Opt-In Plaintiffs, set their pay rates and work schedules, and distributed their payments. (*See* Defs.' St. ¶¶ 117-18, 151-57, 159.) Occasionally, Soares visited the construction sites to "merely conduct[] quality control inspections on behalf of Sovereign." (*Id.* ¶ 209). But it was the foremen, not Soares, who supervised the subcontractors' work. (*See, e.g., id.* ¶ 207; Flavio Decl. (Dkt. 130) ¶¶ 12-13; Andre Decl. (Dkt. 132) ¶¶ 8-9.) While working on Sovereign construction sites, Opt-In Plaintiffs were not supposed to use any of Sovereign's tools that were on the jobsites. (Defs.' St. ¶¶ 146-47, 200-01.) Instead, they had to bring their own equipment to work. (*Id.* ¶ 146; *see, e.g.,* Junior Decl. (Dkt. 131) ¶ 13.) With occasional work on the weekends, Opt-In Plaintiffs were expected to work under standard construction work hours during weekdays. (Defs.' St. ¶ 222.)

### B. Procedural Background

In its June Order, this court provided a detailed summary of the procedural background of this case. Briefly, Named Plaintiffs filed their initial complaint on January 24, 2019, alleging, on behalf of themselves and those similarly situated, that Defendants are liable for failing to provide laborers overtime pay as required under the FLSA and NYLL. (Compl. (Dkt. 1) ¶¶ 1-2, 54-64.) Named Plaintiffs also alleged that Defendants failed to provide them with wage notices as required by New York's Wage Theft Prevention Act. (*Id.* ¶¶ 65-70.) On April 24, 2019, Plaintiffs amended their complaint, adding Soares as a named Defendant but retaining the same claims as those alleged in the initial complaint. (*See* Am. Compl. ¶¶ 1-2, 64-80.) For about a year after Named Plaintiffs filed their initial complaint, thirty-six Opt-In Plaintiffs filed consent to sue forms to join the action. (*See* Defs.' St. ¶¶ 14-33.) Then, on September 30, 2020, Judge Sterling

Johnson denied Defendant Soares's motion to dismiss. (*See generally* Mem. and Order Denying Mot. to Dismiss (Dkt. 76).)[3] The parties proceeded to discovery. During discovery, "Opt-In Plaintiffs consistently failed to respond to court orders or failed to sufficiently provide discovery materials." (*See* June Mem. and Order at 6-7 (summarizing instances of Opt-In Plaintiffs' repeated failures to comply with this court's orders).)

On February 23, 2024, Defendants filed their unopposed omnibus motion: (1) to dismiss nine Opt-In Plaintiffs' claims with prejudice for failure to participate in discovery or prosecute their claims; (2) for summary judgment; and, in the alternative, for (3) decertification of the collective action. (*See* Defs.' Not. of Omnibus Mot. (Dkt. 124) at 1-2.) In June 2024, the court denied the Defendants' motions for summary judgment and decertification. (*See* June Mem. and Order at 39.) As relevant here, this court also dismissed nine Opt-In Plaintiffs' claims for failure to cooperate in the discovery process, pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, and for failure to prosecute, pursuant to Rule 41(b) of the same. (*Id.* at 11-12.) That left 27 Opt-In Plaintiffs[4] and six Named Plaintiffs with claims pending against the Defendants. On August 16, 2024, this court scheduled the case for jury selection on February 10, 2025, and

---

[3] This action was reassigned to this court on October 13, 2022, following Judge Johnson's passing. (*See* Docket Entry dated 10/13/2022.)

[4] The remaining 27 Opt-In Plaintiffs are: (1) Catalino Sanchez Antonio, (2) Jose Arce, (3) Yoni Arevalo, (4) Andres Bedon, (5) Yader Ariel Roque Calero, (6) Jackson Jose Cruz Reyes, (7) Ilmer Delgado, (8) Misael Francisco De Paz Ramirez, (9) Francisco Espinales, (10) Jesus Salvador Gomez, (11) Miguel Hernandez, (12) Wilson Alejandro Jadan, (13) Juan Lituma, (14) Carlos Monge, (15) Franklin Mora, (16) Darwin Olivas, (17) Cristhian Ortega, (18) Oscar Ortega, (19) Oscar Otero, (20) Elio Portillo, (21) Santiago Roca, (22) Jose Fidel Rodriguez, (23) Saleh Saleh, (24) Jose Eduardo Suriaga, (25) Wilfredo Velasquez Vargas, (26) German Ventura, and (27) Angel Augusto Zavala Tixi. (*See* Req. for Admis. ("RFA") (Dkt. 127-10) at 9; *see also* Mot. at 1 n.1.)

directed the parties to contact the chambers of Magistrate Judge James R. Cho to schedule a pre-trial conference. (*See* Min. Entry dated 08/16/2024.) Defendants' instant summary judgment motion against the remaining Opt-In Plaintiffs followed. (*See generally* Mot.) Consistent with their pattern of failing to comply with this court's orders, Opt-In Plaintiffs did not submit an opposition brief.

## II. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure allows a party to move for summary judgment "identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "A district court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63, 68 (2d Cir. 2024);[5] *see also* Fed. R. Civ. P. 56(a). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact." *See Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003); *see also* Fed. R. Civ. P. 56(c).

There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "the mere existence of *some* alleged factual dispute between the parties" alone is not enough to defeat a properly supported summary judgment motion. *Id.* at 247-48; *see also Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("Mere conclusory allegations . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist."); *Savinova v. Nova Home*

---

[5] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

*Care, LLC*, No. 20-CV-1612 (SVN), 2024 WL 1345183, at *11 (D. Conn. Mar. 29, 2024) (concluding that an interrogatory response, "[a]bsent additional evidence, . . . is highly conclusory and fails to create a triable issue of fact"). The movant carries the burden of proving that no genuine factual dispute exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). But the nonmoving party "is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256; *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (same).

In reviewing a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008) (holding that the court must view all facts "in the light most favorable" to the non-moving party). "However, in determining what may reasonably be inferred" from evidence in the record, a court should not afford the non-movant "the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990); *Contemp. Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981) ("[I]t is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint[.]"); *Ke v. J R Sushi 2 Inc.*, No. 19-CV-7332 (PAE) (BCM), 2022 WL 912231, at *9 (S.D.N.Y. Mar. 28, 2022) (finding that interrogatory answers included only conclusory statements based on which no reasonable juror could infer that defendants were employers under the FLSA or the NYLL).

"[I]f a non-moving party fails to oppose a summary judgment motion, then summary judgment, *if appropriate*, shall be entered against him." *Vermont Teddy Bear Co.*, 373 F.3d at 244 (emphasis in original); *see also* Fed. R. Civ. P. 56(e)(2)-(3) (allowing the

court to consider unopposed facts as undisputed or grant summary judgment "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it"). To that end, where the summary judgment motion is unopposed, courts rely on the movant's Rule 56.1 statement *when such statements are supported by the record. See Vermont Teddy Bear Co.*, 373 F.3d at 244; E.D.N.Y. Loc. Civ. R. 56.1(c) (noting that "[e]ach numbered paragraph in the statement of material facts . . . served by the moving party will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by . . . the opposing party").

Even then, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *See Vermont Teddy Bear Co.*, 373 F.3d at 242 (clarifying that Rule 56 "does not embrace default judgment principles"). "[F]ailure to oppose a motion for summary judgment *alone* does not justify the granting of summary judgment." *Id.* at 244 (emphasis added); *see also Giannullo*, 322 F.3d at 140-41 ("[T]he non-movant is not required to rebut an insufficient showing."). As such, the court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vermont Teddy Bear Co.*, 373 F.3d at 244. In doing so, the court "may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement." *Id.* It must also "be satisfied that the citation to evidence in the record supports the assertion." *Id.*; Fed. R. Civ. P. 56(c)(1)(A) (requiring the parties to "cit[e] to particular parts of materials in the record" when "asserting that a fact cannot be . . . disputed").

In resolving a motion for summary judgment, "[a]ny matter admitted under Rule 36(a) is 'conclusively established' and may be used for summary judgment unless the court upon motion permits withdrawal or amendment of the admission." *Attick v.*

*United States*, 904 F. Supp. 77, 79 (D. Conn. 1995). It is also "well settled that a failure to respond to a request to admit will permit the District Court to enter summary judgment if the facts as admitted are dispositive." *Moosman v. Joseph P. Blitz, Inc.*, 358 F.2d 686, 688 (2d Cir. 1966) ("The District Court could have granted summary judgment on the claims, as the request to admit is comprehensive.").

## III. DISCUSSION

Defendants move for summary judgment as to all 27 Opt-In Plaintiffs' claims. (*See generally* Mot.) Specifically, they argue that by not responding to the Requests for Admissions ("RFAs"), Opt-In Plaintiffs have "made 101 admissions that dispositively demonstrate that Defendants did not employ them and therefore cannot be found liable for their claims in this action." (*Id.* at 1.) Opt-In Plaintiffs have not filed a response to Defendants' motion. The court finds that the economic reality shows that Defendants are not the employers of any of the 27 Opt-In Plaintiffs as a matter of law. Defendants have met their burden to show that no genuine factual dispute exists, and none of the Opt-In Plaintiffs has come forward with any evidence to create a genuine factual dispute. *Weinstock*, 224 F.3d at 41 ("A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). After "examining the moving party's submission," the court is "satisfied that the citation to evidence in the record supports the assertion" that Defendants are not the employers of any of the Opt-In Plaintiffs. *Vermont Teddy Bear Co.*, 373 F.3d at 244.

### A. Legal Framework

In relevant part, the FLSA dictates that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less

than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA defines employer to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" *Id.* § 203(d). This definition, however, references the word—"employer"—it attempts to define. *See Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013) (noting that "the statute's definition of 'employer' relies on the very word it seeks to define"). "The statute nowhere defines 'employer' in the first instance." *Id.* Likewise, the NYLL, in a somewhat circular fashion, defines "employer" by referencing the same word in the definition. *See* NYLL art. 19 § 651.6 (defining "employer" as "any individual, partnership, association, corporation, limited liability company, business trust, legal representative, or any organized group of persons acting as *employer*" (emphasis added)). Given the lack of guidance offered by the statutory scheme, for FLSA purposes, the Second Circuit "has treated employment . . . as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008).

Whether the tests for "employer" status are the same under the FLSA and the NYLL remains an open question. *See Irizarry*, 722 F.3d at 117 (rejecting the plaintiffs' assertion that the tests are the same). However, "district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA." *Inclan v. N.Y. Hosp. Grp.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015); *Ocampo v. 455 Hosp. LLC*, No. 14-CV-9614 (KMK), 2016 WL 4926204, at *5 n.7 (S.D.N.Y. Sept. 15, 2016) ("Courts regularly apply the same tests to determine whether entities are joint employers for purposes of the FLSA and NYLL."); *Olvera v. Bareburger Grp.*, 73 F. Supp. 3d 201, 206 (S.D.N.Y. 2014) ("The statutory standard for employer status under NYLL is nearly identical to that of the FLSA.").

10

Adhering to the Supreme Court's consistently liberal interpretation of the FLSA, the Second Circuit has relied on the "economic reality" test to determine "whether an employer-employee relationship exists for purposes of the FLSA." *Barfield*, 537 F.3d at 141 (acknowledging that "the [Supreme] Court has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts'" (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961))). The purpose of the test is "to expose outsourcing relationships that lack a substantial economic purpose." *Jean-Louis v. Metro. Cable Comms., Inc.*, 838 F. Supp. 2d 111, 121 (S.D.N.Y. 2011). To achieve that purpose, courts within the Second Circuit apply the "formal-control" (*Carter* test) and the "functional-control" (*Zheng* test) factors to determine the economic realities of the relationship between the purported employer and employee. *Barfield*, 537 F.3d at 142-43 (recognizing that the Second Circuit has "identified different sets of relevant factors based on the factual challenges posed by particular cases").

The *Carter* test examines "the degree of formal control exercised over a worker." *Id.* at 143. To that end, it asks, "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984). The *Zheng* test "assess[es] whether an entity that lacked formal control nevertheless exercised functional control over a worker." *Barfield*, 537 F.3d at 143. To find the answer, it inquires about:

> (1) whether [the purported joint employer's] premises and equipment were used for the plaintiff's work; (2) whether the [subcontractor] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that

11

was integral to [purported joint employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [purported joint employer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [purported joint employer].

*Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003).

But "[t]he court is also free to consider any other factors it deems relevant to its assessment of the economic realities." *Id.* at 72-73. And it "need not decide that *every* factor weighs against joint employment" to grant summary judgment for the putative joint employer. *Id.* at 75-77 (highlighting that "the 'economic reality' test . . . has been distilled into a nonexclusive and overlapping set of factors"); *Irizarry*, 722 F.3d at 105 (clarifying that "[n]one of the factors used in any of these cases, however, comprise a rigid rule for the identification of an FLSA employer"). Under the Second Circuit's guidance, the *Zheng* test is "most relevant in the context of subcontractor relationships." *Granda v. Trujillo*, No. 18-CV-3949 (PAE), 2019 WL 367983, at *5 (S.D.N.Y. Jan. 30, 2019) (citing *Greenawalt v. AT&T Mobility LLC*, 642 F. App'x 36, 37-38 (2d Cir. 2016) (explaining that the FLSA claims brought against the defendants by security guards employed by subcontractors "hinges on a third test, first developed in *Zheng*") (summary order)); *Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 451 (S.D.N.Y. 2019) (same); *Monzano-Moreno v. Libqual Fence Co.*, No. 18-CV-161 (MKB) (AKT), 2021 WL 730663, at *9 (E.D.N.Y. Feb. 5, 2021) (same), *report and recommendation adopted*, 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021).

Moreover, a worker can have more than one employer under the FLSA. *See* 29 C.F.R. § 791.2; *see also Zheng*, 355 F.3d at 66 ("The regulations promulgated under the FLSA expressly recognize that a worker may be employed by more than one entity at the

same time."). "To determine joint employment under the FLSA or NYLL, the Second Circuit uses the same 'economic reality' test as that used to assess employer status generally. Courts apply the same factors discussed above, which are aimed at assessing whether 'control' exists over the workers in question." *Ortiz v. Consol. Edison Co. of N.Y.*, No. 22-CV-8957 (JLR) (GS), 2024 WL 3086161, at *10 (S.D.N.Y. June 7, 2024), *report and recommendation adopted*, 2024 WL 3105686 (S.D.N.Y. June 24, 2024). Where "the facts establish that the employee is employed jointly by two or more employers . . . all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions" of the FLSA, "including the overtime provisions, with respect to the entire employment for the particular workweek." 29 C.F.R. § 791.2(a); *Barfield*, 537 F.3d at 150 (affirming the district court's determination that the joint employer was liable for overtime pay under the FLSA).

### B. Application

#### 1. Consideration of Default Admissions

First, in resolving the current motion, this court will consider Defendants' RFAs as admitted by each Opt-In Plaintiff, as they failed to respond to those RFAs. (June Mem. and Order at 16 n.13 (recognizing that "Opt-In Plaintiffs did not respond to Requests for Admissions").) Pursuant to Rule 36(a)(3) of the Federal Rules of Civil Procedure, "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3). And "unless the court, on motion, permits the admission to be withdrawn or amended," such admitted matter "is conclusively established." Fed. R. Civ. P. 36(b); *Donovan v. Carls Drug Co.*, 703 F.2d 650, 652 (2d Cir. 1983) ("Because the language of the Rule is permissive, the court is not required to make an exception to Rule 36 even if both the merits

and prejudice issues cut in favor of the party seeking exception to the rule."), *overruled in part on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). Rule 56 states that "[a] party asserting that a fact cannot be . . . genuinely disputed must support the assertion by," among other things, citing to an admission. *See* Fed. R. Civ. P. 56(c)(1)(A).

It follows then that the court may consider the admissions when ruling on a summary judgment motion. *See Moosman*, 358 F.2d at 688 (confirming that Rule 36(a) admissions may be used for Rule 56 summary judgment); *see also Paniagua v. Walter Kidde Portable Equip., Inc.*, 183 F. Supp. 3d 473, 482 (S.D.N.Y. 2016) (same); *Virga v. Big Apple Const. & Restoration Inc.*, 590 F. Supp. 2d 467, 471 (S.D.N.Y. 2008) ("For the purposes of summary judgment, matters admitted under rule 36(a) of the Federal Rules of Civil Procedure may be used for summary judgment under rule 56."). That remains true even if the admissions were made by default. *See Atl. Sea Pride, Inc. v. McCarthy*, No. 13-CV-670 (LEK), 2013 WL 5652492, at *2 (N.D.N.Y. Oct. 15, 2013) (emphasizing that Rule 36(a) admissions, "even default admissions, can serve as the factual predicate for summary judgment") (collecting cases); *see also Buffalo Laborers Welfare Fund v. Di Pizio Constr. Co.*, 318 F. Supp. 3d 591, 597 (W.D.N.Y. 2018) (same); *Gibson v. SCE Grp.*, 391 F. Supp. 3d 228, 250 (S.D.N.Y. 2019) (finding facts conclusively established where plaintiffs neither timely responded to RFAs nor made a motion for the default admissions to be withdrawn or amended).

In its June Order, for the reasons explained therein, this court did not consider the default admissions in support of Defendant's previous summary judgment motion. (June Mem. and Order at 16 n. 13 (explaining that "the court does not distinguish between Opt-In Plaintiffs and Named Plaintiffs for the purposes of this motion").) Instead, the June Order noted that "[t]he court may consider the impact of the RFAs to Opt-In Plaintiffs' claims on a

separate motion." (*Id.* (clarifying that "although [the court] does not consider the[] admissions in support of Defendants' present summary judgment motion, it does not reject that these facts are admitted").) Defendants have now filed such a motion. And the court has no reason to believe that Opt-In Plaintiffs' counsel's repeated and continuing failure to follow court orders and respond to motions "resulted from an oversight by counsel such that it would unduly prejudice the Opt-In Plaintiffs" to deem these facts admitted. (*See id.*; *see also* Pls.' Resp. Letter to Pre-Motion Conf. Request (Dkt. 136) at 2 (admitting—and the court agrees—that counsel's "failure: the fact that [the] office was swamped with work . . . and the difficulty in communicating with roughly 30 non-English speaking plaintiffs – rings utterly hollow").) Furthermore, as of the date of the publication of this Order, Opt-In Plaintiffs have *still* not responded to the RFAs. Nor have they made a motion to permit withdrawal or amendment of any of their default admissions.[6] *See Gibson*, 391 F. Supp. 3d at 250 (acknowledging that, on motion, Rule 36(b) allows the court to permit the admission to be withdrawn or amended but emphasizing that plaintiffs made no such motion). Accordingly, in resolving the pending motion for summary judgment, the court will consider the matters contained in the RFAs that it previously deemed admitted. *See* Fed. R. Civ. P. 36(a)(3). (*See also* June Mem. and Order at 16 n.13.)

2.    Previously Resolved *Carter* and *Zheng* Factors

Next, the court will not revisit the findings it made in favor of the Defendants in its June Order. The law-of-the-case doctrine dictates that "when a court has ruled on an issue, that decision

---

[6] About four months have passed since Opt-In Plaintiffs' deadline to file their response to Defendants' motion for summary judgment. (*See* Min. Entry dated 08/16/2024 (setting the deadline for Opt-In Plaintiffs' opposition brief for September 20, 2024).) Still, Opt-In Plaintiffs have not filed a response.

should generally be adhered to by that court in subsequent stages in the same case." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009). "The doctrine of the law of the case is not an inviolate rule," but a "discretionary doctrine." *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982). Still, the court "will adhere to its own prior rulings in a given case absent cogent or compelling reasons to deviate, such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest justice." *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991); *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (same); *Myers v. Hertz Corp.*, 624 F.3d 537, 545 (2d Cir. 2010) (acknowledging the district court judge's refusal to revisit the earlier decision in the case pursuant to the law-of-the-case doctrine in an action brought under the FLSA and New York state law for failure to pay overtime wages).

In denying the Defendants' first motion for summary judgment in June 2024, this court concluded that three of the four *Carter* factors and two of the six *Zheng* factors supported the Defendants' position. (*See, e.g.,* June Mem. and Order at 17-18 (concluding that the subcontractors were responsible for making individual hiring and firing decisions because there was "no evidence in the record before the court that the Defendants made individual hiring and firing decisions of the Plaintiffs").) Specifically, the court found that the following *Carter* factors weighed against a finding of joint employment: "(1) the power to hire and fire the employees, . . . (3) determin[ing] the rate and method of payment, and (4) maintain[ing] employment records." *See Carter*, 735 F.2d at 12. (*See also* June Mem. and Order at 20.) Likewise, the court found that two of the *Zheng* factors—"(2) whether the [subcontractor] had a business that could or did shift as a unit from one putative joint employer to another" and "(4) whether responsibility under the contracts could pass from one subcontractor to another without material changes"—weighed against a finding of joint employment and warranted granting

summary judgment to Defendants. *See Zheng*, 355 F.3d at 72. (*See also* June Mem. and Order at 23-24, 28-29, 35.)[7]

No "intervening change in law, availability of new evidence, or . . . clear error" warrants a second look here. *See Johnson*, 564 F.3d at 99-100 (refusing to depart from the earlier ruling where the appellant "does not point to either a change in controlling law or new evidence, and [the court] cannot say that manifest injustice will result from adhering to [its] earlier order"). Indeed, Opt-In Plaintiffs have not even filed a response to Defendants' motion to convince this court otherwise. For their part, the Defendants' submission relies on the same supporting facts as their omnibus motion did. (*See* Mot. at 3.) And Opt-In Plaintiffs' interrogatory responses and deposition testimonies do not generate a genuine dispute as to any material fact. Therefore, "[t]he court will not revisit issues that it resolved in" favor of the Defendants in its previous ruling on a motion for summary judgment "because those decisions are the law of the case." *Disability Advocs., Inc. v. Paterson*, No. 3-CV-3209 (NGG) (MDG), 2009 WL 1312112, at *1-2 (E.D.N.Y. May 8, 2009) (barring the defendants from re-litigating some of the issues for trial and post-trial briefing that the court had already resolved on a motion for summary judgment).

### 3.    Remaining *Zheng* Factors

Having established that it will consider the Rule 36(a) admissions and not revisit the factors discussed in its June Order under the law-of-the case doctrine, the court now turns to the remaining *Zheng* factors. Because the inquiry under the fifth *Zheng* factor is "largely the same" as that under the second *Carter* factor, the court analyzes those factors together. *See Jean-Louis*, 838 F.

---

[7] Similarly, the court found that "the premises on which Plaintiffs worked does not weigh in favor of finding joint employment" because there was "no evidence that Defendants had a possessory interest in the jobsites." (*Id.* at 21.)

Supp. 2d at 126 n.7 (applying "the second *Carter* factor bearing in mind the Second Circuit's admonition" in *Zheng* "that supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry"). Accordingly, the court addresses each remaining *Zheng* functional control factor as to all 27 Opt-In Plaintiffs in turn below.

### a. *Factor 1: Shared Premises and Equipment*

First, the court finds that the "shared premises and equipment" factor still weighs against granting summary judgment as to Darwin Olivas ("Olivas"), Wilfredo Velasquez Vargas ("Vargas"), and Jackson Jose Cruz Reyes ("Reyes"), but weighs in favor of granting summary judgment as to the remaining 24 Opt-In Plaintiffs. The relevant inquiry here is whether the purported joint employer's "premises and equipment were used for the plaintiffs' work." *Zheng*, 355 F.3d at 72. This "is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." *Id.* The court has already determined that "the premises on which Plaintiffs worked does not weigh in favor of finding joint employment" because there is "no evidence that Defendants had a possessory interest in the jobsites." (June Mem. and Order at 21.) This finding equally applies to all the Opt-In Plaintiffs because they worked on the same premises. (Defs.' St. ¶¶ 46, 56.) Now, the court addresses the equipment prong of this factor.

Defendants submit that Opt-In Plaintiffs "were not supposed to use any of Sovereign's tools at the Sovereign Sites" because "Sovereign did not provide equipment" for them. (*Id.* ¶ 147; Soares Decl. ¶ 34 ("Sovereign also did not provide equipment to the Plaintiffs on the job sites."); Warner Decl. ¶ 49 (same); *id.* ¶ 29 ("[I]t was the responsibility of the subcontractor to . . . pay for all . . . equipment and materials used in connection with its performance of the subcontract.").) Subcontractors' foremen's

declarations further support this point. (*See* Flavio Decl. ¶ 15 (stating that subcontractors required Opt-In Plaintiffs "to bring their own equipment to the job sites"); *see also* Junior Decl. ¶ 13 (same); Andre Decl. ¶ 11 (same).) Many Opt-In Plaintiffs have also testified that they brought their own tools, helmets, gloves, and boots to jobsites and did not wear any clothing that belonged to Sovereign. (*See, e.g.,* Suriaga Tr. (Dkt. 127-18) 75:2-5 ("Q. Did you bring any of your own tools on that day? A. My harness, my hard hat, my hammer, my tape measure, my calculator."); Augusto Tr. (Dkt. 127-19) 69:11-23 (testifying that he brought his own helmet, harness, and chain to Manhattan jobsite); Ramirez Tr. (Dkt. 127-25) 116:14-24 (confirming that he brought his own helmet, harness, hammer, plyers, yo-yos,[8] gloves, and boots to work, and had his name written on them).)

However, some Opt-In Plaintiffs averred that even though they brought their own tools, they also used equipment available at the jobsite with Sovereign's name on it. (*See* Olivas Tr. (Dkt. 127-17) 109:5-6 (stating that "any equipment that they gave you had [Sovereign's] name on it"); Vargas Tr. (Dkt. 127-26) 109:9-16 (testifying that he used yo-yos that Sovereign provided and had Sovereign's name on them at some point in 2017); Reyes Tr. (Dkt. 127-28) 77:13-78:6 (clarifying that he brought his own helmet and hammer but there was a storage room "where the tools that you need to use or borrow for the day . . . would be stored").) Furthermore, Olivas testified that "the company would give [them] saws and a yo-yo," as well as "harnesses." (Olivas Tr. 98:18-20.)

Opt-In Plaintiffs' responses to Defendants' interrogatories also state that they "were given Sovereign apparel and Sovereign tools." (*See* Resps. to Interrogs. ("ROG") (Dkt. 127-7) at 23; *see*

---

[8] As defined by one of the workers, "yo-yo" or "yoyo" is a cord that one connects to a harness that would hold up workers to prevent their fall from a height if they slip. (*See* June Mem. and Order at 21 n.16.)

*also id.* at 26 ("The opt-in employees know from firsthand experience that Silva and Marques distributed Sovereign apparel to plaintiffs when they were hired").) But most of the Opt-In Plaintiffs do not provide any support or explanation for the conclusory statements that these tools and apparel belonged to Sovereign. Therefore, as to those Opt-In Plaintiffs who have not been deposed—or testified contrary to their interrogatory responses that they brought their own tools to jobsites—the "mere existence of *some* alleged factual dispute" in their interrogatory responses alone is not enough to defeat a properly supported summary judgment motion. *See Anderson,* 477 U.S. at 247-48. Their responses to interrogatories are "conclusory allegations" that "cannot by themselves create a genuine issue of material fact." *See Hicks,* 593 F.3d at 166; *see also Savinova,* 2024 WL 1345183, at *11 (concluding that an interrogatory response, "[a]bsent additional evidence, . . . is highly conclusory and fails to create a triable issue of fact"). These responses simply "restat[e] the conclusory allegations contained in [the] complaint," which "cannot defeat a motion for summary judgment." *See Contemp. Mission, Inc.,* 648 F.2d at 107 (affirming the district court's grant of summary judgment). (*Compare* Am. Compl. ¶ 38 ("Plaintiffs used Sovereign's tools, stored in Sovereign's tool shed, each labeled with Sovereign's name on them, to perform their duties."), *with* ROG at 23 ("The opt-in plaintiffs . . . were given Sovereign apparel and Sovereign tools to use in completing their work.").) Defendants' uncontradicted submissions leave no room for a genuine issue that those Opt-In Plaintiffs used their own equipment at the jobsites.

Nevertheless, the same cannot be said about Olivas, Vargas, and Reyes because their deposition testimonies further supplement the interrogatory responses that Defendants' "equipment were

used for the plaintiffs' work." *Zheng*, 355 F.3d at 72.[9] Because "the evidence is such that a reasonable jury could return a verdict for" Olivas, Vargas, and Reyes based on this factor, the court is unable to conclude as a matter of law that Olivas, Vargas, and Reyes did not use Defendants' equipment. *See Anderson*, 477 U.S. at 248. Defendants would have the court conclude that "this factor should be fully weighed against a finding of joint employment" because "there is no question of fact" based on Opt-In Plaintiffs' admissions. (Mot. at 16.) It appears that Defendants are misinterpreting the relevant *Zheng* inquiry. The first *Zheng* factor does not ask who provided the tools for use at work. Rather, the inquiry is whether the purported joint employer's "equipment w[as] used for the plaintiffs' work." *Zheng*, 355 F.3d at 72. This is an objective inquiry. It is irrelevant who ultimately provides the equipment so long as it belongs to Sovereign. Similarly, it is also irrelevant that subcontractors "required their workers . . . to bring their own tools" or that Opt-In Plaintiffs "were not supposed to use any of Sovereign's tools at the Sovereign Sites." (Defs.' St. ¶¶ 146-47, 201.) Opt-In Plaintiffs' admissions only admit that Junior and Flavio, not Soares, gave them apparel and tools labeled "Sovereign" to use in completing their work. (RFA ¶¶ 4-5, 26-27, 45-46.) These admissions do not establish that the equipment belonged to Junior and Flavio. Additionally, Defendants acknowledge that Sovereign "ha[d] its own equipment on the jobs sites[.]" (Soares Decl. ¶ 34.) As the court must draw all reasonable inferences in non-movant's favor, there is a genuine dispute as to whether Olivas, Vargas, and

---

[9] The court acknowledges that, initially, it seems unclear to which company—Sovereign or one of the subcontractors—Olivas is referring when discussing the company that provided harnesses, saws, and a yo-yo. (*See* Olivas Tr. 98:18-20.) But when considering the question, it is implied in his response that he was referring to Sovereign when mentioning that "any equipment that they gave you had their name on it." (*Id.* 109:1-6 (responding to the question whether "some of the tools that [Olivas] w[as] using [had] the name Sovereign on them?").)

Reyes used Sovereign's equipment. *Holcomb*, 521 F.3d at 132 (holding that the court must view all facts "in the light most favorable" to the non-moving party).

In this case, given the conflicting deposition testimonies, coupled with interrogatory responses, the court concludes that this factor still weighs against granting summary judgment as to Olivas, Vargas, and Reyes. With respect to the remaining Opt-In Plaintiffs, however, the court finds that this factor weighs in favor of granting summary judgment because "sharing premises weighs against joint employment," (*see* June Mem. and Order at 23), and there is no genuine question of fact that the remaining 24 Opt-In Plaintiffs did not use Defendants' equipment. *Anderson*, 477 U.S. at 256 (explaining that "the plaintiff is not . . . relieved of his own burden of producing in turn evidence that would support a jury verdict").

### b.   *Factor 3: Integral to Process of Production*

Second, the court finds that the third *Zheng* factor—whether Opt-In Plaintiffs performed a line-job that was integral to Sovereign's process of production—weighs in favor of denying summary judgment as to all the Opt-In Plaintiffs. This factor directs courts to examine "the extent to which plaintiffs performed a line-job that is integral to the putative joint employer's process of production." *Zheng*, 355 F.3d at 73. And where plaintiffs perform such work, this factor weighs in favor of finding joint employment. *Id.* ("Interpreted broadly, this factor could be said to be implicated in *every* subcontracting relationship.") However, "because all subcontractors perform a function that a general contractor deems 'integral' to a product or service," the Second Circuit does "not interpret th[is] factor . . . broadly." *Id.*

Instead, the Second Circuit has identified two kinds of work that lie on opposite spectra of this test. "On one end of the spectrum lies the type of work . . . that requires minimal training or equipment, and which constitutes an essential step in the producer's

integrated manufacturing process." *Id.* At the other end of the spectrum is work that "is not part of an integrated production unit, . . . is not performed on a predictable schedule, and . . . requires specialized skills or expensive technology." *Zheng*, 355 F.3d at 73. When classifying the remaining "business relationships that fall in between these two poles" the Second Circuit instructs district courts to consider "both industry custom and historical practice." *Id.* (insisting that the Second Circuit "resist[s] the temptation to say that any work on a so-called production line . . . should attract heightened scrutiny").

For example, widespread industry custom "of using subcontractors to complete a particular task . . . is unlikely to be a mere subterfuge to avoid complying with labor laws." *Id.*; *Jean-Louis*, 838 F. Supp. 2d at 134 (relying on industry custom in determining whether this factor shows joint employment or not). Conversely, where "plaintiffs can prove that, as a historical matter, a contracting device has developed in response to and as a means to avoid applicable labor laws, the prevalence of that device may . . . be attributable to widespread evasion of labor laws." *Zheng*, 355 F.3d at 74.

Here, Sovereign entered into subcontracts with various subcontractors, who hired workers, including Opt-In Plaintiffs, to perform construction work. (Defs.' St. ¶ 45; Warner Decl. ¶ 16.) Among other things, Opt-In Plaintiffs worked as carpenters and rebar workers at Sovereign's worksites. (*See, e.g.*, Olivas Tr. 68:2-17 ("It was always carpentry work."); Martinez Tr. (Dkt. 127-24) 72:16-23 (testifying that he did rebar work while working at Sovereign jobsites); *see also* ROG at 3-11 (listing all Opt-In Plaintiffs' duties while working for Sovereign).) This is clearly not the kind of labor that "requires specialized skills" in the construction industry. *Zheng*, 355 F.3d at 73; *see also Greenawalt*, 642 F. App'x at 39 (observing that it is reasonable to conclude that security guards who greet customers and assist store managers do not

possess "specialized skills" distinct from those of ordinary retail employers). It was also "performed on a predictable schedule," which supports a finding of joint employment. *Zheng*, 355 F.3d at 73. (*See* Defs.' St. ¶ 222 ("The Project sites operated under standard construction work hours.").)

Defendants argue that "[t]he Opt-In Plaintiffs' work was not integral to Defendants' process of production" because "it was never Sovereign's business to perform the actual construction work." (Mot. at 18-19.) In other words, Sovereign was "only to ensure that project deliverables were met on time and met standards of quality." (*Id.* at 19; Defs.' St. ¶¶ 52 ("Sovereign employees . . . did not perform actual construction work."), 209 ("[W]hen onsite at the Sovereign Sites, Soares was merely conducting quality control inspections on behalf of Sovereign.").) For that purpose, Sovereign entered into an agreement—the Prime Contract—with the owner or developer of the project. (*See* Defs.' St. ¶ 42; *see also* Warner Decl. ¶ 13.)[10] Defendants insist that this contract is for "the owner or real estate developer" to "hire[] a construction manager or general contractor to oversee the work being performed on the project." (Defs.' St. ¶ 41; Warner Decl. ¶ 13.)

But they also admit that "[t]he nature of Sovereign's business . . . was to serve as a prime contractor for superstructure work." (Defs.' St. ¶ 180; Warner Decl. ¶ 4; Soares Decl. ¶ 2.) And copies of subcontractor agreements provided by the Defendants suggest that "[t]he Prime Contract provides for the *furnishing of labor, materials, equipment and services in connection with the construction* of the Project." (*See, e.g.,* Fowler Ave. Agreement at 1

---

[10] Yet again, Defendants have not furnished a copy of the Prime Contract for this court's review. (*See* June Mem. and Order at 3 (emphasizing that the agreements provided by the Defendants "reference[] other 'Subcontractor Documents' that were not provided to the court").)

(emphasis added).)[11] While the subcontractor agreements provide that the subcontractor shall "[s]upply labor to perform work for Sovereign," (*see id.* art. 8), these agreements do not specify what kind or portion of the work outlined in the Prime Contract is delegated to subcontractors. As such, there remains genuine doubt as to whether the Defendants' involvement was limited to simply overseeing the projects. It is reasonable to infer that Sovereign agreed to perform at least some construction work under the Prime Contract. *See Johnson*, 680 F.3d at 236 (explaining that, at summary judgment stage, the court must draw all reasonable inferences in non-movant's favor). Because Defendants have made "an insufficient showing," Opt-In Plaintiffs are "not required to rebut" the Defendants' argument. *See Giannullo*, 322 F.3d at 141-42.

Defendants could have clarified this confusion by discussing industry custom or providing a copy of the Prime Contract. *See Jean-Louis*, 838 F. Supp. 2d at 134 (collecting cases demonstrating that cable companies customarily "contract with installation companies"). They have done neither. Indeed, as this court noted in its earlier decision, general construction industry custom is not dispositive where the subcontractor "was hired to do the very same tasks that the original subcontractor often did." (June Mem. and Order at 25 (citing *Zavala v. PEI Elec. Servs. Grp.*, No. 20-CV-9437 (PAE) (GWG), 2022 WL 2312794, at *11 (S.D.N.Y. June 28, 2022), *report and recommendation adopted*, 2022 WL 2712853 (S.D.N.Y. July 13, 2022)).)[12] Therefore, because there

---

[11] For simplicity, the court only references one of the subcontractor agreements because they include the same relevant terms. (*See* June Mem. and Order at 3 n.4.)

[12] Defendants argue that *Zavala* is distinguishable because there, "the putative employer was a subcontractor hired to perform electrical work that it normally could perform, but chose to use a sub-subcontractor instead." (Mot. at 19.) That is not different from what Sovereign was tasked with

remain disputed factual issues, this court cannot conclude as a matter of law that Opt-In Plaintiffs did not "perform[] a line-job that [was] integral" to Sovereign's process of production. *Zheng*, 355 F.3d at 73. This factor weighs against granting summary judgment as to all Opt-In Plaintiffs.

### c.   *Factor 5: Supervision of Plaintiff's Work*

Next, this court finds that as a matter of law, Defendants did not supervise Opt-In Plaintiffs' work to such a degree that Defendants are deemed to be their employers. The fifth functional control factor asks to what degree "the defendants supervise the plaintiff's work." *Zheng*, 355 F.3d at 74-75. This is the most relevant factor "in determining whether a purported joint employer exercises functional control over plaintiffs." *Godlewska v. HDA*, 916 F. Supp. 2d 246, 264 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Hum. Dev. Ass'n*, 561 F. App'x 108 (2d Cir. 2014) (summary order). The Second Circuit in *Zheng* cautioned that to avoid misinterpreting this factor "to encompass run-of-the mill subcontracting relationships," courts must look for extensive supervision such that "it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Zheng*, 355 F.3d at 74-75 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 726 (1947) (suggesting the slaughterhouse owner's close scrutiny of the boners' work played a role in setting the boners' schedule)). Unlike extensive supervision, for example, "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry" because that "is perfectly consistent with a typical, legitimate subcontracting

---

pursuant to the Prime Contract—"furnishing of labor, materials, equipment and services in connection with the construction of the Project." (Fowler Ave. Agreement at 1.) Evidence in the record also shows that Opt-In Plaintiffs performed work that was done by Sovereign employees as well. (*See* June Mem. and Order at 27 (comparing work performed by Named Plaintiffs, which is the same as Opt-In Plaintiffs' work, to work performed by Sovereign employees).)

agreement." *Zheng*, 355 F.3d at 75. However, "the law does not require an employer to look over his workers' shoulders every day in order to exercise control." *Barfield*, 537 F.3d at 147.

Accordingly, courts have made the following distinction: a finding of joint employment is not warranted "where the putative joint employer maintains specific standards to which its contractors and the contractors' employees must adhere, and regularly monitors the contractor's employees to ensure that their performance satisfied the putative joint employer's expectations[.]" *See Monzano-Moreno*, 2021 WL 730663, at *11; *see also Jean-Louis*, 838 F. Supp. 2d at 128 (concluding that communicating with workers does not constitute "control over the work or working conditions of the employee[s]"). But "where the putative joint employer is responsible for the day-to-day management of the contractor's employees," such a finding logically follows. *See Monzano-Moreno*, 2021 WL 730663, at *11; *but see Vasto v. Credico (USA) LLC*, No. 15-CV-9298 (PAE), 2017 WL 4877424, at *9-11 (S.D.N.Y. Oct. 27, 2017) (finding that this factor strongly favors the defendant because although "joint employer status may be found even where control is exercised only occasionally . . . evaluation and monitoring to ensure productivity and compliance is not tantamount to control").

The record is clear that the subcontractors and their foremen, not the Defendants, supervised and controlled the subcontractors' work. (*See, e.g.*, Defs.' St. ¶ 207 ("Soares did not supervise any of the Plaintiffs"); Flavio Decl. ¶¶ 12-13 (same); Andre Decl. ¶¶ 8-9 (same).) Opt-In Plaintiffs' admissions and deposition testimonies confirm the same. (*See, e.g.*, RFA ¶ 55 (admitting that Soares did not directly supervise Opt-In Plaintiffs); Olivas Tr. 53:15-54:6 (testifying that Flavio was his direct supervisor and "every day, he would tell [the workers] what to do"); Martinez Tr. 51:1-23 (confirming that Junior was the person in charge of each work site).) It is true that Opt-In Plaintiffs' responses to interrogatories

provide that they "were instructed by defendants as to their work schedules and work locations and duties[.]" (ROG at 23.) How-ever, these answers are not more than "worthless boilerplate." *See J R Sushi 2 Inc.*, 2022 WL 912231, at *3 (rejecting the plain-tiff's boilerplate pre-deposition interrogatory answers claiming that the defendant supervised her). And where Opt-In Plaintiffs' responses provide more detailed answers, they suggest that sub-contractors' foremen, not the Defendants, had supervisory power. (*See* ROG at 24-25 (providing specific timelines of when Junior took disciplinary action against some of the Opt-In Plain-tiffs).)

Opt-In Plaintiffs' interrogatory responses also assert that they "personally saw defendant Soares hand the weekly pay enve-lopes to Silva and/or Marques, who would then distribute these envelopes to the employees[.]" (*Id.* at 25.) Again, these responses merely parrot the Complaint. (*See* Am. Compl. ¶ 55 ("The cash was provided to plaintiffs in envelopes delivered by defendant Soares to the foremen at the construction sites to be distributed to the plaintiffs and other employees.").) They do not specify *when* or *where*—particularly, at which jobsites—Soares handed the envelopes.[13] As such, they are no more than boilerplate state-ments and cannot create a triable issue of fact. These statements do not offer any evidence as to how Soares or any Sovereign rep-resentative was "responsible for the day-to-day management" of Opt-In Plaintiffs' work. *See Monzano-Moreno*, 2021 WL 730663,

---

[13] Similarly, Opt-In Plaintiffs' other interrogatory responses claiming that Soares spoke directly to some of the Opt-In Plaintiffs are conclusory. (*See, e.g.*, ROG at 29 ("Soares would speak directly to Darwin Olivas and Eddy Martinez about what work needed to be done at the job site and how to do it.").) Without providing additional details, these responses "cannot by themselves create a genuine issue of material fact." *See Hicks*, 593 F.3d at 166; *see also Savinova*, 2024 WL 1345183, at *11 (rejecting that an inter-rogatory response alone creates a triable issue of fact because it "is highly conclusory").

at *11. Although "the law does not require an employer to look over his workers' shoulders every day in order to exercise control," *see Barfield*, 537 F.3d at 147, the record is devoid of any evidence suggesting that Defendants exercised such supervision that "it demonstrates effective control of the terms and conditions of the plaintiff's employment." *See Zheng*, 355 F.3d at 75.

The court also notes that some Opt-In Plaintiffs' deposition testimonies initially appear to suggest that Soares was directly involved in the construction work. Closer scrutiny of those testimonies, however, shows that they do not leave a genuine dispute as to any material fact. For example, Angel Augusto Zavala Tixi ("Augusto") testified that Soares gave him his schedule, while Oscar Otero Mendez ("Otero") testified that Soares was one of the foremen at one of the construction sites. (Augusto Tr. 41:9-15 ("Q. Who gave you the schedule at Flushing? . . . A. And Wendell [Soares]."); Otero Tr. (Dkt. 127-21) 69:16-70:4 (testifying that "the foreman was Wendel [Soares]").) But their testimonies relate to events that took place in 2015 and 2014, respectively. (*See* Augusto Tr. 33:15-36:24; *see also* Otero Tr. 69:16-23.) That is before Sovereign was incorporated as an entity in 2017. (*See* Defs.' St. ¶ 4; *see also* Warner Decl. ¶ 5.) And these Opt-In Plaintiffs have not presented any evidence demonstrating that Sovereign existed as an entity before 2017.

Therefore, this court finds that the fifth functional control factor—supervision of Opt-In Plaintiffs' work—weighs in favor of granting summary judgment as to all Opt-In Plaintiffs.

### d.    *Factor 6: Exclusive or Predominant Work for the Alleged Joint Employers*

Lastly, the court concludes that there remain genuine issues of material fact as to the final *Zheng* functional control factor. This factor considers "whether the purported joint employees worked exclusively or predominantly for the putative joint employer." *Zheng*, 355 F.3d at 75. When plaintiffs perform labor only for the

purported joint employer during the relevant time period, this factor weighs in favor of a finding of joint employment. *See Jean-Louis*, 838 F. Supp. 2d at 135 (finding that this factor weighs in favor of plaintiffs because "[t]he parties do not dispute that, during the time period at issue in t[he] case, . . . technicians performed installations only for" the defendant); *see also Vasto*, 2017 WL 4877424, at *15 (same). Similarly, spending 40 or more hours of a work week at one worksite tilts this factor in favor of finding joint employment. *See Alvarez v. Fine Craftsman Grp.*, No. 20-CV-10452 (GDB) (JW), 2023 WL 2908659, at *5 (S.D.N.Y. Jan. 23, 2023) (concluding that plaintiffs worked predominantly for the joint employer because they "worked between 40 and 51.5 hours per week" for him), *report and recommendation adopted as modified*, 2023 WL 2424145 (S.D.N.Y. Mar. 9, 2023). On the flip side, "where a subcontractor performs merely a majority of its work for a single customer, there is no sound basis on which to infer that the customer has assumed the prerogatives of an employer." *Zheng*, 355 F.3d at 75.

Here, Defendants failed to meet their burden. First, Defendants' own submission supports a finding that Opt-In Plaintiffs worked at least 40 hours a week on Sovereign project sites. (*See* Defs.' St. ¶ 222 ("The Project sites operated under standard construction work hours: Mondays through Fridays, 7:00 a.m. to 3:30 p.m. . . . There was no work on Sundays and rarely any work on Saturdays."); *see also* Junior Decl. ¶ 15 (same); Flavio Decl. ¶ 16 (same); Andre Decl. ¶ 12 (same).) Working such hours for a single entity weighs in favor of finding joint employment. *See Alvarez*, 2023 WL 2908659, at *5. Second, Opt-In Plaintiffs' interrogatory responses provide further support for the same. (*See* ROG at 14-18 (stating that each Opt-In Plaintiff worked more than 40 hours a week at a Sovereign worksite).) Third, some Opt-In Plaintiffs' testimonies demonstrate that they worked significantly more than 40 hours a week at some of the Sovereign sites. (*See, e.g.*, Portillo Tr. (Dkt. 127-23) 39:16-40:1 ("We went in to

work at 7 a.m., and we'd get out at different times, sometimes at 6, sometimes at 7 in the evening. . . . Sometimes we'd get out at 5; we'd get out at 7 or even later."); Gomez Tr. (Dkt. 127-27) 73:20-74:23 (testifying that he worked from 7 a.m. to 6 or 7 p.m. at the Court Square location).)

Defendants counter that this factor weighs in their favor because Opt-In Plaintiffs "have admitted to working at several non-Sovereign worksites under the same general conditions, supervised by Junior and Flavio." (Mot. at 17-18; *Compare* RFA ¶¶ 72, 74-75, 80-82, 84-85, 90-92, 94-95, 100-101 (referring to Opt-In Plaintiff's work at non-Sovereign worksites), *with* Defs.' St. ¶ 46 (listing Sovereign's worksites).) Defendants are correct about Opt-In Plaintiffs' admissions. But Defendants' point misses the mark. This factor would weigh in favor of the Defendants "if a subcontractor were to work exclusively for two or three general contractors on those contractors' premises without the resources to work for any other contractor." *Zheng*, 355 F.3d at 75 n.12. Opt-In Plaintiffs do not admit that they worked for other contractors *while* they were also working at Sovereign sites. They only admit that Opt-In Plaintiffs, *at some point*, worked at other construction sites. Defendants have not provided any evidence that Opt-In Plaintiffs were working for various other contractors while working at Sovereign sites. Because there are disputed issues of material fact, this would be a question for the jury to decide.

Thus, Defendants have not met their "burden of demonstrating that no material issue of fact remains for trial" on this factor. *Vermont Teddy Bear Co.*, 373 F.3d at 244. Accordingly, this court cannot conclude as a matter of law that this factor weighs in favor of Defendants.

### 4.  Summary of Findings

Overall, after considering the default admissions, the court concludes that the fifth *Zheng* factor weighs in favor of granting summary judgment as to all Opt-In Plaintiffs. Significantly, this

factor is "largely the same" as the only remaining *Carter* factor, *see Jean-Louis*, 838 F. Supp. 2d at 126 n.7, and the most relevant factor "in determining whether a purported joint employer exercises functional control over plaintiffs," *see Godlewska*, 916 F. Supp. 2d at 264. The third and sixth *Zheng* factors weigh against granting summary judgment as to all Opt-In Plaintiffs. While the first *Zheng* factor weighs against granting summary judgment as to Olivas, Vargas, and Reyes, it weighs in favor of granting summary judgment as to the remaining 24 Opt-In Plaintiffs. Therefore, combined with this court's earlier findings in favor of the Defendants, (*see* June Mem. and Order at 35-36 (summarizing court's findings as to *Carter* and *Zheng* factors)), now, all four *Carter* formal control factors weigh in favor of granting summary judgment as to all Opt-In Plaintiffs. Additionally, four *Zheng* factors support granting summary judgment as to 24 Opt-In Plaintiffs, while three of them support the same outcome as to Olivas, Vargas, and Reyes.

The court notes that its factual findings as to the *Carter* and *Zheng* factors concentrate on the "economic reality" of the relationship between Opt-In Plaintiffs and Defendants rather than technical concepts. *See Barfield*, 537 F.3d at 141. To that end, the focus of the court's inquiry was "not intended to bring [a] normal, strategically-oriented contracting scheme[] within the ambit of the FLSA." *See Zheng*, 355 F.3d at 76. The record shows that this is exactly the kind of relationship that existed between Opt-In Plaintiffs and Defendants. It logically follows then that, "evaluat[ing] the 'economic reality' of the relationship," the court finds that Defendants were not employers of any of the 27 Opt-In Plaintiffs as a matter of law. *See Carter*, 735 F.2d at 12. Therefore, this court GRANTS Defendants' motion for summary judgment against all 27 Opt-In Plaintiffs.

**IV.  CONCLUSION**

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment. The parties are DIRECTED to file a status report with a proposed deadline for submitting their joint pretrial order within seven days of this Order.

SO ORDERED.


Dated:      Brooklyn, New York
            January 15, 2025

                                        s/Nicholas G. Garaufis
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge